IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

LARRY CHEESE,
*Defendant.*

CRIMINAL NO.:  ELH-08-0415

**MEMORANDUM OPINION**

Defendant Larry Cheese, through counsel, has filed a motion for compassionate release or reduction in sentence, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  ECF 502 (the "Motion").  The Motion is supported by exhibits.  ECF 502-1 to ECF 502-4.  Judge William Quarles, Jr., to whom the case was initially assigned, sentenced Cheese in 2009 to a term of 292 months' incarceration for the offense of conspiracy to distribute more than 30 kilograms of heroin, in violation of 21 U.S.C. § 846.  ECF 217 (Judgment).  In September 2016, Judge Marvin Garbis reduced the sentence to 235 months of imprisonment, pursuant to Amendment 782 to the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines").  ECF 383.[1]

The government opposes the Motion (ECF 505, the "Opposition"), supported by an exhibit.  ECF 505-1.  Defendant has replied.  ECF 507 (the "Reply").

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion, in part.  I shall reduce defendant's sentence from 235 months to 204 months of incarceration.

---

[1] The case was reassigned to Judge Garbis following the retirement of Judge Quarles.  After the retirement of Judge Garbis, it was reassigned to me.

## I.        Procedural and Factual Background[2]

Cheese and seven codefendants were indicted on August 28, 2008.  ECF 2.  In particular, defendant was charged with conspiracy to distribute and possess with intent to distribute 50 grams or more of cocaine base, *i.e.*, crack cocaine, and one kilogram or more of heroin, in violation of 21 U.S.C. § 846 and § 841(a), (b).

Cheese was arrested on August 29, 2008 (ECF 76) and has been incarcerated ever since. He entered a plea of not guilty on September 5, 2008.  *See* Docket.  As the trial date approached, the government produced over 1100 pages of *Jencks* material that identified approximately fifteen cooperating witnesses.   ECF 505 at 1-2, *see* 18 U.S.C. § 3500; *Jencks v. United States*, 353 U.S. 657 (1957).[3]  On May 20, 2009, the government filed a notice seeking enhanced penalties, pursuant to 21 U.S.C. § 851.  ECF 155.

On June 1, 2009, hours before jury selection was to begin, Cheese entered a plea of guilty to conspiracy to distribute one kilogram or more of heroin.  ECF 169.  The plea was tendered pursuant to a Plea Agreement.  ECF 172.  In the factual stipulation contained in the Plea Agreement, *id.* ¶ 6(a), Cheese admitted that members of the conspiracy conspired to distribute more than 30 kilograms of heroin.  Paragraph 6(a) stated:

> Commencing in or about 2004 and continuing until in or about July 2008, the Defendant conspired with a number of other individuals to distribute and

---

[2] To the extent relevant, I incorporate the factual summary contained in ECF 477, which is a Memorandum Opinion pertaining to codefendant Jamal Stewart.

[3] The government asserts that the *Jencks* material was provided to the defendant's family, "who then plastered these documents on street poles, bars, and other locations throughout the Westport community."  ECF 505 at 2, n.1.  According to the government, the "disclosure resulted in the murder" of Kareem Guest.  *Id.*  Antonio Hall has since been convicted for that crime.  *Id.* But, the government states: "Intercepted jail calls from [defendant's] account two days before Guest's murder confirmed that [defendant] and Elliot Brown, the other co-defendant that [sic] plead guilty the day of trial, consulate[d] with family members regarding the circulation of this information. . . ."  *Id.*

possess with intent to distribute heroin in and around the area of the Westport Section of Baltimore City, Maryland. The Defendant was a street lieutenant for the organization headed by Jamal Stewart and sold heroin (under the brand name "Dynasty").

At various times during the period of the conspiracy the Defendant was observed by law enforcement operating the "street shop," controlling the distribution of heroin by street workers, in and around the Westport Section of Baltimore City.

The Government's evidence consists of, among other things, the testimony of cooperating witnesses; seizures of narcotics, narcotics proceeds, and other evidence pursuant to search warrants; video surveillance of operation of the street shop, and recorded conversations among the conspirators.

The parties further stipulate that based on the facts readily provable by the Government, the Defendant along with other members of the conspiracy conspired to distribute more than 30 kilograms of heroin.

The parties agreed to a base offense level of 38 under the Guidelines. The government also agreed to a two-level reduction under U.S.S.G. § 3E1.1(a), based on defendant's acceptance of responsibility. *Id.* ¶ 6(c). However, the government declined to make a motion under § 3E1.1(b) for a third reduction point. *Id.* Accordingly, the parties contemplated a final offense level of 36. *Id.* ¶ 11.

Sentencing was held on October 16, 2009. ECF 214. At the time of sentencing, defendant was 28 years old. *See* Presentence Report ("PSR"), ECF 511 at 1.[4] Defendant is 5'7" tall and, at the time, he weighed 170 pounds. *Id.* ¶ 71. The defendant had a history of substance abuse but had never attended a substance abuse treatment program. *Id.* ¶ 72.

The PSR reflected that Cheese had seven prior adult criminal convictions, of which four scored points. *Id.* ¶¶ 25-39. In particular, in 1998, at the age of 17, defendant was convicted as an

---

[4] The Court obtained a copy of the Presentence Report from both the Probation Office and the Chambers file of Judge Quarles. I have docketed, under seal, the one found in Judge Quarles's file, which contains a few handwritten notations.

adult of second degree assault and a handgun offense, for which he was sentenced to three years of incarceration, with two years, four months, and 28 days suspended. ECF 511, ¶ 25.[5] In 2002, at the age of 20, defendant was found guilty of unlawful possession of a controlled dangerous substance and was sentenced to three years of incarceration with all but one day suspended. *Id.* ¶ 27. Cheese violated his probation and received a one-year sentence. In 2005, at the age of 23, defendant was found guilty of driving with a suspended license and was sentenced to 60 days of imprisonment. *Id.* ¶ 29. A year later, Cheese was again convicted of driving with a suspended license and was sentenced to 30 days of imprisonment. *Id.* ¶ 34. In January 2006, defendant was convicted of a drug possession offense. *Id.* ¶¶ 31, 32. He was convicted of a firearm offense in June 2007. *Id.* ¶¶ 36, 37. He received a suspended sentence for the drug offense, *id.* ¶ 31, but violated his probation and was sentenced to one year of imprisonment. *Id.* For the firearm offense, the defendant received a two-year sentence. *Id.* ¶ 36. However, no points were assessed for either offense (¶¶ 31, 36) because the offenses occurred during the period of the underlying conspiracy. *Id.* ¶¶ 33, 38.

Judge Quarles found that the defendant had an adjusted offense level of 36 and a criminal history category of V. ECF 218 (Statement of Reasons). The Guidelines called for a sentence of incarceration ranging from 292 to 365 months. *Id.* On October 16, 2009, Judge Quarles sentenced the defendant to a term of 292 months of imprisonment. ECF 217. He also imposed a term of five years of supervised release. *Id.*

In the Plea Agreement, Cheese waived many of his rights to appeal. ECF 172, ¶ 11. Nevertheless, defendant noted an appeal to the Fourth Circuit. ECF 215. The Fourth Circuit affirmed in a per curium opinion decided on February 17, 2011. ECF 283; *see United States v.*

---

[5] This appears to have been a "time served" sentence.

4

*Cheese*, 411 Fed. App'x 609 (4th Cir. 2011) (per curiam).  The mandate followed on March 11, 2011.  ECF 284.

On September 15, 2016, Cheese filed a motion for a sentence reduction under 18 U.S.C. § 3582(c)(2) and Guideline Amendment 782.  ECF 381.  Judge Garbis granted the motion and reduced defendant's sentence to 235 months, which corresponds to the bottom of the defendant's revised Guidelines.  ECF 383.

Defendant is currently incarcerated at FCI McKean.  *Inmate Locator*, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited December 8, 2022).  The Bureau of Prisons ("BOP") indicates that he has a projected release date of April 23, 2027.  With credit for pretrial detention dating from August 29, 2008, defendant has served about 171 months of his 235-month sentence, or approximately 70% of his sentence.

On June 29, 2021, defendant, through counsel, petitioned the Warden for compassionate release based on the gross disparity between the sentence he received and the sentence imposed on Jermar Stewart, the lead defendant.  ECF 502-1.  Cheese received no response, and this Motion followed.  ECF 502.

Defendant seeks a reduction of his sentence to time served, based on a combination of factors, including his underlying medical conditions, in combination with the COVID-19 pandemic.  In particular, defendant asserts that he is obese and has hypertension.  ECF 50-2 at 8. In addition, defendant complains of "the gross and unwarranted disparity between Mr. Cheese's sentence and the much lower sentence Mr. Stewart received for being the leader of both heroin and cocaine trafficking in the drug conspiracy[.]"  *Id.* at 1.

The government does not contest that defendant has exhausted his administrative remedies. ECF 505 at 3.  The government also concedes that Cheese's "underlying medical conditions make

him eligible for compassionate release." *Id.* at 7.  But, the government notes that defendant "is fully vaccinated and his risk for serious medical conditions from COVID are dramatically reduced." *Id.*[6]  In any event, the government argues that the sentencing factors in 18 U.S.C. § 3553(a) support a denial of relief.  ECF 505 at 13-15.

Additional facts are included, *infra*.

## II.     Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Bethea*, ___ F.4th ___, 2022 WL 17588045, at *3 (4th Cir. Dec. 13, 2022), amended Dec. 14, 2022; *United States v. Ferguson,* ___F.4th___, 2022 WL 17256572, at *3 (4th Cir. Nov. 29, 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality.  *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was first enacted as part of the Sentencing Reform Act of 1984.  Originally,

---

[6] According to defendant's medical records, Cheese received his second dose of the Pfizer vaccine on March 24, 2021.  ECF 456-2 at 28.

it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See Bethea*, 2022 WL 17588045, at * 3; *see e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. No. 115-391, 132 Stat. 5194 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a federal inmate to file a motion for compassionate release directly with the court after exhaustion of administrative remedies.  Specifically, pursuant to the 2018 FSA, the Court may reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  *Id.*  So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release.  *Ferguson*, 2022 WL 17256572, *3; *Jenkins*,

22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276. This constituted a sea change in the law.

But, under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met. *Bethea*, 2022 WL 17588045, at *3. And, the court must conclude that the movant satisfies both of criteria. *Id.*; *see Hargrove*, 30 F.4th at 194-95.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief." *Bethea*, 2022 WL 17988045, at *3 (citation omitted). If that criteria is met, the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing factors., to the extent those factors are applicable." *Id. See also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021).

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169. But, the Fourth Circuit has said: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release. *See McCoy,* 981 F.3d at 276-77.[7] In

_____

[7] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C). *See McCoy,* 981 F.3d at 276.

particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "Other Reasons," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act. *McCoy*, 981 F.3d at 276. Of significance here, it is *only* "directed at BOP requests for sentence reductions." *Id.* (citing U.S.S.G. § 1B1.13). Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. And, "[a]s

of now, there is no Sentencing Commission policy statement 'applicable' to the defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also United States v. Brice*, ___ F. App'x ___, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam); *Hargrove*, 30 F.4th at 194-95.  Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170. However, "[i]n deciding a motion for compassionate release, the district court is confined to the evidence presented." *Bethea*, 2022 WL 17588045, at *5, n.2; *see also United States v. Osman*, 2022 WL 485183, at *1 (4th Cir. Feb. 17, 2022).

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197.  Notably, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam).  Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t).  And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).

Moreover, the Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169. However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.

Of relevance here, the Supreme Court decided *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022. In that case, the Supreme Court ruled, in the context of § 404(b) of the First Step Act, that, when raised by the parties, the district court is obligated to consider intervening changes in the law and factual developments. *Id.* at 2396; *see Brice*, 2022 WL 3715086, at *2.

In sum, there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release. Nevertheless, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194. And, as mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted); *see Concepcion*, 142 S. Ct. at 2396; *Jenkins*, 22 F.4th at 169.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020). And, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

As noted, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C.

§ 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Bethea*, 2022 WL 17588045, at *3; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167. Additionally, "the district court is less likely to have abused its discretion

if it considered arguments in opposition to its ultimate decision." *Bethea*, 2022 WL 17588045, at *6; *see also High*, 997 F.3d at 189; *Kibble*, 992 F.3d at 332.

Notably, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion." *Bethea*, 2022 WL 17588045, at *6; *see Hargrove*, 30 F.4th at 200. In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190). And, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling." *Bethea*, 2022 WL 17588045 at *6; *see Kibble*, 992 F.3d at 332.

### III.    COVID-19[8]

### A.

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[9] COVID-19 spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

---

[8] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[9] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (last accessed June 15, 2020).

People who are stricken with the coronavirus sometimes experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, Reuters (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of December 13, 2022, COVID-19 has infected more than 99 million Americans.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed December 13, 2022).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*  That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, Ctrs. for Disease Control & Prevention (Apr. 2, 2020), https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.  Indeed, the

pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus.  The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.  But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In November 2022, it updated its guidance to reflect the most available data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (November 22, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; obesity, where the BMI is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196. Nevertheless, the court may consider the CDC's guidelines. *Bethea*, 2022 WL 17588045, at *4; *United States v. Petway*, 2022 WL 168577, at *3 (4th Cir. Jan. 19, 2022) (per curiam). And, "the inquiry should consider whether the underlying condition places the inmate at an increased risk of severe illness from Covid-19." *Bethea*, 2022 WL 17588045, at *4.

## B.

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to

isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020). And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons,

the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[10]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an

---

[10] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

"extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

### C.

Notably, there is no cure for the coronavirus.  But, medical treatments have continued to improve.  And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer, Moderna, Johnson & Johnson, and Novavax).  *See* Rebecca Robbins and Carl Zimmer, *A fourth*

*COVID vaccine is cleared for use in the United States.*, N.Y. TIMES (July 20, 2022), https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html.   Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons six months of age and older.  *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the.

As of October 2022, approximately 68% of the total U.S. population is fully vaccinated, including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 74% of people from ages 18 to 64, and 93% of people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last updated October 20, 2022).  Moreover, approximately 107.5 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older.  *See id*.; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated November 1, 2022).

Federal regulators approved a second and third booster dose for individuals age 50 and older as well as those at higher risk.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.  Additionally, on September 1, 2022, the CDC recommended updated COVID-19 boosters from Pfizer-BioNTech for people ages 12 years and older and from Moderna

for people ages 18 years and older.  *CDC Recommends the First Updated COVID-19 Booster*, CTRS. FOR DISEASE CONTROL (Sept. 1, 2022), https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html

On January 4, 2021, at about the time of the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf.  It provided that administration of the COVID-19 vaccine (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.  The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.  Much has changed since that time.

As of November 30, 2022, the BOP had 144,753 federal inmates and approximately 36,000 staff.  And, by that date, the BOP had administered 339,863 vaccine doses to staff and inmates. *See* BUREAU OF PRISONS,  https://www.bop.gov/coronavirus/ (last accessed November 30, 2022).

### D.

The number of COVID-19 cases continues to fluctuate.  For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases.  *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been

declining in every region.").  But, the trend was short-lived, due to the spread of the Delta variant
and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19. *See*
*Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION,
https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021)
(noting that the Delta variant is "more than [two times] as contagious as previous variants");  *see*
*also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J.,
Nov. 1, 2021,  https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-
challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the
seven day average in reported deaths has dropped to about 1,400 a day from daily averages above
2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About*
*Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021),
https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August
14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, sparking concern because it was
highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL
& PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last
updated Dec. 13, 2021).  Indeed, Omicron contributed to a substantial and serious spike in COVID-
19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert*
*says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-
thursday/index.html.

But, the number of COVID-19 cases again declined.  *See, e.g.*, Anabelle Timsit, *U.S.*
*coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7,

2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y. And, the country began to return to normalcy.

Unfortunately, we soon experienced another surge in COVID-19 cases. *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html. In particular, in the spring of 2022 a new variant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ." *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases. As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," was "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants." Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/. But, the variant then seemed to subside. *See COVID Data Tracker: Variant Proportions*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last updated Nov. 12, 2022).

At this point, COVID-19 has, in a sense, become a fact of life. *See* Mitch Smith and Julie Bosman, *Covid Deaths Surge Across a Weary America as a Once-Hopeful Summer Ends*, N.Y. TIMES, Sept. 5, 2021, https://www.nytimes.com/2021/09/05/us/covid-surge-united-states.html ("[T]he coronavirus is going to remain a fact of American life for the foreseeable future."). In an interview in September 2022 on the CBS television show "60 Minutes", President Biden claimed

23

that the pandemic is "over" in the United States.  Alexander Tin, *Biden says Covid-19 pandemic is "over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over. We still have a problem with COVID. We're still doing a lotta work on it. . . . But the pandemic is over." *Id*.  On the other hand, news reports suggest that we may experience yet another surge of cases in the coming months.  *See*, *e.g.*, *Quick and stealthy 'Scrabble variants' are poised to drive a winter Covid-19 surge*, CBS NEWS (Oct. 20, 2022), https://www.cbsnews.com/baltimore/news/quick-and-stealthy-scrabble-variants-are-poised-to-drive-a-winter-covid-19-surge/.

With respect to the BOP, it has reported that, as of December 8, 2022, 203 federal inmates, out of a total population of 144,881, and 159 BOP staff, out of some 36,000 staff members, currently test positive for COVID-19.  Moreover, 47,564 inmates and 14,672 staff have recovered from the COVID-19 virus.  In addition, 309 inmates and seven staff members have died from the virus.  The BOP has completed 128,660 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI McKean, where the defendant is imprisoned, the BOP reported that as of December 8, 2022, out of a total of 1,109 inmates, zero inmates and zero staff members have currently test positive,  zero inmates and zero staff members have died of COVID-19, and 385 inmates and 58 staff have recovered at the facility.  In addition, 58 staff members and 1,005 inmates have been inoculated with the vaccine at FCI McKean.  *See* https://www.bop.gov/coronavirus/; BUREAU OF PRISONS,  https://www.bop.gov/locations/institutions/btf/ (last visited December 8, 2022).

#### IV.    Discussion

As stated, defendant argues that extraordinary and compelling circumstances warrant compassionate release.  Defendant relies on his medical conditions, in combination with the asserted sentencing disparity between him and the lead codefendant.  ECF 502 at 1, 7-15.

Cheese's medical records indicate that he suffers from two conditions that the CDC identifies as risk factors for a more serious case of COVID-19.  In particular, defendant's medical records reflect a BMI of 35, which qualifies him as obese under the CDC guidelines, and hypertension.  ECF 505-2 at 112.

Some courts have found that obesity, or even borderline obesity, can serve as a basis for compassionate release.  *See, e.g.*, *United States v. Smith*, 538 F. Supp. 3d 990, 995 (E.D. Cal. 2021) ("Many courts have also found that people who have a body mass index within the ranges defined as 'overweight' or 'obese' are at greater risk of severe COVID-19."); *United States v. Staten*, PJM-01-284-4, 2020 WL 4904270, at *2 (D. Md. Aug. 18, 2020) (finding an "extraordinary and compelling reason" for compassionate release based on a BMI of 38); *United States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (finding obese defendant with a BMI of 32.5 qualified for compassionate release in light of COVID-19); *United States v. Dawson*, No. 18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on a defendant's obesity).  And, some courts have found extraordinary and compelling circumstances when hypertension is the sole condition.  *See, e.g.*, *United States v. Salvagno*, 456 F. Supp. 3d 420, 423, 427-29 (N.D.N.Y. 2020); *United States v. Sawicz*, 453 F. Supp. 3d 601, 604-05 (E.D.N.Y. 2020).

Moreover, as noted earlier, the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*,

*supra*, https://bit.ly/38S4NfY.   Numerous judges have found extraordinary and compelling circumstances for defendants with multiple chronic medical conditions, such as those applicable to Cheese.   *See, e.g.*, *United States v. Azianbidji*, PWG-17-253, 2021 WL 307416, at *1 (D. Md. Jan. 29, 2021) (defendant with hyperlipidemia, hypertension, and obesity); *United States v. White*, CCB-09-369, 2020 WL 3960830, at *2-3 (D. Md. July 10, 2020) (defendant with neutropenia, hyperlipidemia, hypertension, heart disease, chronic kidney disease, and obesity); *Hilow*, 2020 WL 2851086, at *4 (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Quintero*, 458 F. Supp. 3d 130, 132 (W.D.N.Y. 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension constituted an extraordinary and compelling reason); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (concluding that defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason); *United States v. Ullings*, 1:10-CR-00406, 2020 WL 2394096, at *4 (N.D. Ga. May 12, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Foreman*, 3:19-CR-62 (VAB), 2020 WL 2315908, at *4 (D. Conn. May 11, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Quintero*, 08-CR-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and compelling reason).

Defendant has received two doses of the COVID-19 vaccine.   ECF 456-2 at 28.   It is without question that the COVID-19 vaccines have been useful in reducing the health risks posed by the coronavirus.   But, they are not entirely effective, particularly as to the latest variants. Indeed, "[t]he variants have shown a remarkable ability to get around the protection offered by

infection and vaccination."  Carla K. Johnson, *Experts decry little action as COVID-19 cases surge*, BALT. SUN (July 14, 2022).

Moreover, the CDC issued recommendations encouraging everyone ages 12 years and older to receive a COVID-19 booster shot after completing primary COVID-19 vaccination (*see COVID-19 Vaccine Boosters*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3MdQMM6 (last updated August 23, 2022)) and, all adults ages 50 years and older are eligible for a second booster shot.  *Id.*  Yet, the parties have not presented the Court with any evidence regarding whether defendant has received a booster.

In addition, as illustrated above, the future trajectory of the COVID-19 pandemic is anything but predictable.  As Judge Grimm said in *United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021): "It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues."

The CDC has confirmed that breakthrough infections of COVID-19 occur even among vaccinated individuals and, albeit in rare cases, they can result in death.  *See Rates of COVID-19 Cases and Death by Vaccination Status*, CTRS. FOR DISEASE CONTROL & PREVENTION, Mar. 17, 2022, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last accessed May 11, 2022).  An analysis of "nationwide data from the Center for Disease Control and Prevention" revealed that "[t]he vaccinated made up 42 percent of fatalities in January and February [of 2022,] during the highly contagious omicron variant's surge, compared with 23 percent of the dead in September, the peak of the delta wave."  Fenit Nirappil & Dan Keating, *Covid deaths no longer overwhelmingly among the unvaccinated as toll on elderly grows*, Wash. Post (Apr. 29, 2022), https://www.washingtonpost.com/health/2022/04/29/covid-deaths-unvaccinated-boosters/.

Therefore, the fact of defendant's vaccination does not eliminate concerns about underlying health conditions that might otherwise render an individual eligible for compassionate release. Accordingly, that Cheese has been vaccinated against COVID-19 "does not negate that his underlying health conditions make him eligible for compassionate release." *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021).

Further, several judges of this Court have concluded that an inmate is eligible for compassionate release, notwithstanding vaccination status. *See e.g.*, *United States v. Hegie*, RDB-14-411, 2022 WL 605383, at *2 (D. Md. Mar. 1, 2022) (finding that, in light of the COVID-19 pandemic, a fully vaccinated defendant who suffered from obesity and asthma presented an extraordinary and compelling reason for his release); *United States v. Coleman*, PWG-17-393, WL 356724, at *3 (D. Md. Feb. 7, 2022) (determining that, in light of the dynamic nature of the COVID-19 pandemic and the absence of any information concerning the inmate's vaccination status, defendant's underlying medical conditions qualified as an extraordinary and compelling reason for his release); *United States v. Rivas*, TDC-19-0417, 2022 WL 36941, at *2 (D. Md. Jan. 4, 2022) (explaining that vaccinated defendant who was a paraplegic and suffered from frequent urinary tract infections could satisfy the extraordinary and compelling prong of the analysis). "At the end of the day, district judges are not epidemiologists." *United States v. Sherrod*, 19-20139, 2021 WL 3473236, at *5 (E.D. Mich. Aug. 6, 2021).

In light of the evolving nature of COVID-19, coupled with defendant's medical issues, I conclude that Cheese's vaccination status does not render him ineligible for compassionate release. Moreover, I am satisfied that defendant satisfies the "extraordinary and compelling" prong of the § 3582 analysis, based on his medical conditions. And, the Court may consider the sentencing disparity identified by Cheese, discussed *infra*. *See McCoy*, 981 F.3d at 286 ("[T]he district courts

permissibly treated as 'extraordinary and compelling reasons' for compassionate release the severity of the defendants' [] sentences[.]"); *see also Untied States v. Kratsas*, DKC-92-0208, 2021 WL 242501, at *4 (D. Md. Jan. 25, 2021). Similarly, a disparity between a defendant's sentence and those of his codefendants may qualify as an extraordinary and compelling reason for compassionate release. *See*, *e.g.*, *United States v. Payton*, PJM-06-0341, 2021 WL 927631, at *2 (D. Md. Mar. 11, 2021).

Even so, this does not end the inquiry.

The coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.). Even when, as here, a court finds extraordinary and compelling reasons for compassionate release, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of the factors set forth in 18 U.S.C. § 3553(a). *See Bethea*, 2022 WL 17588045, at *5; *High*, 997 F.3d at 186; *see also United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam). These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims. *High*, 997 F.3d at 186. The Court must also consider the factors set forth in 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community. U.S.S.G. § 1B1.13(2).

The government argues that defendant is a danger to the community, citing, *inter alia*, the seriousness of his offense and his prior criminal history. ECF 505 at 12-15. There is no doubt that

defendant's crime was extremely grave. He played a significant role in an extensive drug conspiracy, involving a massive quantity of heroin. Furthermore, Cheese has a significant criminal history. The criminal justice system was repeatedly lenient with Cheese and, on several occasions, he violated his probation. Therefore, a lengthy sentence of incarceration was, and remains, appropriate.

Aside from defendants Elliott Brown and Walter Taylor, Cheese's five other codefendants have been released from prison. ECF 502 at 7. The Court must acknowledge the length of defendant's sentence, even with the earlier reduction of his sentence to 235 months of imprisonment. As defendant points out, his 235-month sentence is more than the sentences of all but one of his codefendants. ECF 502 at 19.

Significantly, defendant's sentence is longer than that of Stewart who, by the government's own description, was the "leader," "[h]ead," and "most culpable" member of the cocaine and heroin drug conspiracies. ECF 474 at 11-12. In contrast, Cheese was a "street lieutenant" in the conspiracy, did not receive a role enhancement, and admitted only to the heroin portion of the conspiracy, but not to the cocaine base portion. ECF 172, ¶ 6(a).

But, the length of a sentence is the product of many factors. The role in the offense is just one of many considerations. A defendant's offense level and criminal history also affect the Guidelines calculation, and these factors vary with each defendant.

Stewart entered a plea on May 15, 2009 (ECF 150), pursuant to Fed. R. Crim. P. 11(c)(1)(C). ECF 151 (Plea Agreement), ¶ 6(d). He received a sentence of 262 months of imprisonment. ECF 199. As noted, defendant initially received a sentence of 292 months. So, from the start, Stewart's sentence was significantly less than defendant's sentence, despite the difference in roles. This disparity was based on factors pertinent to disposition.

Moreover, in considering Stewart's Section 404 motion under the First Step Act (ECF 469), I noted that, if Stewart were sentenced today, he would not quality as a career offender (ECF 477 at 12), and his offense level would be 33 and his criminal history category would be V. *Id.* at 13. This is in contrast to the offense level of 37 and criminal history category of VI, as determined by Judge Quarles at the time of Stewart's sentencing.  ECF 200 (Statement of Reasons).  For various reasons, as stated in ECF 477, I reduced Stewart's sentence to 174 months of imprisonment.  ECF 479.

Codefendant Taylor's Guidelines were 210 to 262 months.  *See* ECF 245 (Statement of Reasons).  Like defendant, he received a sentence at the bottom of his Guidelines.  ECF 244.

Chief Judge James K. Bredar considered the motion for compassionate release of codefendant Elliot Brown.  Judge Quarles sentenced Brown to 360 months (ECF 267), based on an offense level of 36 and a criminal history category of VI.  ECF 268.  Judge Garbis reduced the sentence in 2017 to 292 months, pursuant to Amendment 782.  ECF 428.  Nevertheless, Judge Bredar found that "Brown's excessively long sentence, which is out of step with the lesser sentence received by his more culpable co-defendant [Stewart] . . . qualifies as an extraordinary and compelling reason for a reduction in Brown's 292-month sentence."  ECF 490 at 5.  He reduced Brown's sentence from 292 months to 262 months.  *Id.*

Cheese initially opted for trial, and only decided to plead guilty at the proverbial eleventh hour.  As a result, he did not earn a deduction in his offense level under U.S.S.G. § 3E1.1(b), which was earned by all other codefendants, except Brown, who also waited until the morning of trial to plead guilty.  *See* ECF 92 (Williams Plea Agreement), ¶ 6(c); ECF 94 (Gasque Plea Agreement), ¶ 6(c); ECF 121 (McBride Plea Agreement), ¶ 6(c); ECF 138 (Gray Plea Agreement), ¶ 6(c); ECF 151 (Stewart Plea Agreement), ¶ 6(c); ECF 170 (Brown Re-arraignment); ECF 175 (Brown Plea

Agreement), ¶ 6(c); ECF 185 (Taylor Plea Agreement), ¶ 6(c).  Clearly, the government is entitled to reward a defendant who promptly accepts responsibility for criminal conduct and/or who spares the system the burden of litigating motions and conducting a trial.

Nevertheless, Cheese's sentence of 235 months is arguably in excess of more recent sentences in this District for equally serious offenses.  As Judge Chuang commented when reducing the life sentence for a defendant convicted of being the leader of a drug conspiracy involving more than 50 kilograms of powder cocaine and 1.5 kilograms of cocaine base, "sentences presently imposed in this District for drug trafficking offenses . . . rarely reach 292 months, much less 360 months." *United States v. Nicholson*, No. TDC-03-0268, ECF No. 394 at 10 (D. Md. May 21, 2021).

Rehabilitation efforts should be considered in regard to the Motion.  *See Lancaster*, 997 F.3d at 175 ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *McDonald*, 986 F.3d at 410-12 (noting that on a motion to reduce sentence under the First Step Act, district court must consider defendant's post-sentencing conduct); *United States v. Randall*, 837 Fed. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct).  But, rehabilitation alone cannot serve as a basis for compassionate release.  *Davis*, 2022 WL 127900, at *1.

Cheese has engaged in rehabilitative efforts.  This includes obtaining his GED and taking other vocational and educational courses.  ECF 502-3 at 2.

In considering the Motion, I am also mindful that courts place significant weight on a defendant's post-sentencing conduct, because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)).  The court must "at least weigh the [defendant's] conduct in the years since the initial sentencing." *United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021); *see United States v. Martin*, 916 F.3d 389, 397 (4th Cir. 2019) (requiring an "individualized explanation" as to rehabilitative efforts).  Cheese's behavior while in BOP custody is an important indicator of whether he remains a danger to the community.  *See* 18 U.S.C. § 3582(c)(1)(A)(ii).  And, his conduct is troubling.

Defendant has had a series of infractions while in custody.  Most of them are quite serious. ECF 505-1.  They include assaulting another inmate (January 2019); possessing a dangerous weapon (October 2018, June 2016, and November 2010); fighting with another person (June 2016); stealing (April 2013); and threatening bodily harm (January 2011 and February 2011).  *Id.* This disturbing pattern of infractions weighs very heavily in the Court's analysis.

However, I may also consider that some of defendant's incarceration occurred in the midst of a global pandemic, which generally has "increased the severity of the sentence beyond what was originally anticipated . . . ." *United States v. Green*, TDC-10-761, 2020 WL 2992855, at *4 (D. Md. June 4, 2020); *see also United States v. Park*, 456 F. Supp. 3d 557, 563 (S.D.N.Y. 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary").

Given the gravity of Cheese's underlying offense, his prior record, and his infractions while in custody, immediate release is wholly unwarranted.  However, the length of Cheese's sentence, as compared to that of certain codefendants, coupled with his medical conditions, and the

challenges posed by the pandemic, combine to create a basis for a reduction of defendant's sentence.

The First Step Act "does not constrain the Court to decide between immediate release or no reduction at all, and instead leaves the Court discretion in its evaluation of the appropriate sentence once it finds 'extraordinary and compelling reasons.'"  *United States v. Braxton*, JKB-09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020).  Thus, the Court's decision need not be confined either to immediate release or leaving the existing sentence intact.  The statutory text of the First Step Act allows courts to "reduce the term of imprisonment" upon a finding of "extraordinary and compelling reasons."  18 U.S.C. § 3582(c)(1)(A).

Numerous district courts in both this Circuit and others have granted sentence reductions without immediate release.  *See, e.g.*, *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733, at *5 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *Braxton*, 2020 WL 4748536, at *5 (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37-38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05-00029, 461 F.Supp.3d 343, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); see *also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . .").

Accordingly, I find that a reduction from 235 months to 204 months is reasonable in light of the circumstances of this case.  Such a sentence is "sufficient, but not greater than necessary" to comply with the purposes of incarceration.  18 U.S.C. § 3553(a).

### V.      Conclusion

For the reasons stated above, I shall grant the Motion, in part.  Cheese's sentence shall be reduced from 235 months to 204 months of imprisonment.  The terms and conditions of supervised release to which Cheese was originally sentenced will remain in place.

An Order follows, consistent with this Memorandum Opinion.


Date: December 15, 2022                              _____/s/_____
                                                     Ellen L.  Hollander
                                                     United States District Judge